State vs. McEvoy.

---

HEARD NOVEMBER TERM, 1877.

## STATE *vs.* McEVOY.

Under the Act (General Statutes, Chapter CXXXIX, ∫ 1, p. 746,) grand jurors were drawn in January, 1876, to serve during that year, and at the next term of the Court, held in the same month and year, they were, before being empaneled, discharged by the Court on the ground of fraud and illegality. A special term was then ordered by the Judge to be held in March of the same year, and the grand jury which had been drawn in January, 1875, having been summoned to attend, did so, and at the regular term in May found a bill of indictment for murder: *Held*, That the indictment was valid.

Under the law as it stood in 1876, (see General Statutes, Chapter CXXXIX, ∫ 1, p. 746,) if a grand jury drawn in January to serve during that year should be discharged at the next term of the Court before they were empaneled, the grand jurors who had been drawn and who had served during the preceding year could be recalled and their acts would be valid.

At the trial of an indictment for murder, certain declarations of the deceased, which were reduced to writing by a Trial Justice and signed and sworn to by the deceased about one hour after the fatal wound was given, and which he the next day, within about an hour of death, when he was conscious of his hopeless condition, in speaking to his physician, said that he intended these to be considered as his dying declarations, were properly received in evidence.

BEFORE MAHER, J., AT AIKEN, MAY, 1876.

This case is fully stated in the opinion of the Court.

*Whipper*, for appellant.

*Henderson*, contra.

February 4, 1878. The opinion of the Court was delivered by

McIVER, A. J. The prisoner was indicted for the murder of James J. Gregg at Graniteville, in the County of Aiken, on the

20th day of April, 1876. The bill of indictment was found at the May Term of the Court of General Sessions for that County, of the same year, and the prisoner was tried and convicted of murder at the same term. Upon his arraignment, and before pleading, the prisoner, by his counsel, moved to quash the indictment, upon the ground "that the grand jury by which the said indictment was found are not the legally constituted grand jury of the said County, they having already been drawn and returned, and having served at each term of said Court for the year 1875 and until another grand jury was empaneled in their stead as required by law, to wit, the grand jury which was empaneled at the January Term of this Court for the year 1876," as will appear by reference to the records hereunto annexed marked "B." This motion was overruled by the Circuit Judge and the defendant excepted. The trial then proceeded, and during its progress testimony as to certain declarations made by the deceased shortly before his death was offered on the part of the State as the dying declarations of the deceased, and objected to by the counsel for the prisoner, upon the ground "that the said declaration was not distinctly and substantially proven to have been made by the deceased while conscious in his own mind of his impending death." This objection was also overruled and the testimony received as competent, to which the prisoner, by his counsel, excepted. The prisoner, by his counsel, now moves in this Court to arrest the judgment, upon the ground that the grand jury which found the bill of indictment was not a legal grand jury, and for a new trial upon the ground of error in admitting the declarations of the deceased as dying declarations.

The facts upon which the motion in arrest of judgment is based, as disclosed by the records marked B, are as follows: At the January Term, 1876, of the Court of General Sessions for Aiken County, after the names of the persons summoned as grand jurors for that year had been called, *but before they were empaneled,* it was brought to the attention of the Circuit Judge that the drawing of the jury "had been fraudulently conducted, and that the jury box had been practiced upon;" whereupon, after investigation, "the Court declared that the listing and drawing of the jurors for the present term was a palpable fraud, and that the persons returned and in attendance as jurors were not lawful jurors, and ordered that they be discharged." A special term of the Court was then ordered to be held on the fourth Monday in March next after the

date of the order, and the Sheriff was ordered to summon the grand jurors who had served during the year 1875, to attend as such at the special term, and they did attend, with the exception of three who were absent. It would seem, therefore, that in consequence of the fraud in drawing jurors for the January Term, 1876, no new grand jury for that year could be obtained, inasmuch as, under the law as it then stood, grand jurors could only be drawn prior to that term, and, therefore, from necessity, the grand jury which had been drawn for the year 1875 was continued.

The question is, therefore, presented whether such a grand jury was a legal grand jury. We are glad to be relieved from the necessity, in so grave a case as this, of considering the technical question, which has been raised, as to whether a motion to quash the indictment was the proper mode of presenting the objections, because, even conceding that the objection was presented in the proper mode, we are entirely satisfied that the objection cannot be sustained. By Section 1 of Chapter CXXXIX of General Statutes, page 746, it is provided that "the Clerk of the Court of General Sessions in each County, not less than fifteen days before the commencement of the first term of the Court in each year, shall issue writs of *venire facias* in each County for eighteen grand jurors, to be returned to that Court, who shall be held to serve at each term throughout the year *and until another grand jury is empaneled in their stead."* The grand jury, therefore, which found the bill of indictment in this case was the legal jury, not only for the year of 1875, but also until another grand jury was *empaneled* in their stead ; not merely until another grand jury was drawn or summoned, but *empaneled*.

Now, leaving out of view the question as to whether the persons who were supposed to have been drawn as grand jurors for the year 1876 could be said to have been legally either drawn or summoned in face of the determination of the Court that the proceedings of the Board of Jury Commissioners by which such persons were said to have been so drawn "was a palpable fraud," and it is very certain that such persons were never *empaneled* as a grand jury, and, therefore, by the express terms of the statute above quoted, the persons who had served as a grand jury during the year 1875 continued to be the legal grand jury of that County, and were so when they found the bill of indictment in this case. Stress is laid upon the fact that at September Term, 1875, the Circuit Judge ordered "that the grand jury be discharged, and that it be paid," and it is

argued that after the grand jury has been formally discharged and has left the presence of the Court it cannot be recalled. Passing by the question whether the words above quoted from the journals of the Court imported anything more than the usual discharge at the termination of the labors of the grand jury at each term of the Court, and conceding the fact, which does not appear in the case, that this was designed to be a final discharge, we are at a loss to see how it can affect the question under consideration, for certainly the order of a Circuit Judge cannot have the effect of repealing or suspending the operation of a statute. If in this case the Circuit Judge had, at September Term, 1875, in the most explicit terms finally discharged the grand jury for that year, and if, at the same time, as we have seen, the statute continued them in office until another grand jury was empaneled, it surely could not for a moment be doubted that the statute would render such a discharge a nullity.

The motion for a new trial upon the ground of error in admitting the declarations of the deceased as dying declarations grows out of the following state of facts:

The fatal wound was inflicted in Graniteville on the 20th April, 1876, and on the same day the deceased made the declarations in question, which were taken down in writing, signed and sworn to by the deceased, before a Trial Justice, while deceased was on the railroad train which took him to his home in Augusta, Ga., where he died the next day. A very short time before his death, probably about an hour, Dr. Campbell, who was in the train when the Trial Justice read the declarations to the deceased, had a conversation with the deceased, as to which he testified as follows:

"I asked him, 'Mr. Gregg, what do you think of your case?' He replied, 'What do you think of it?' I said, 'You know, James, gun-shot wounds in the abdomen are very uncertain.' He then said, 'If you say that, I will die certain.' He referred to my general disposition to have a hopeful view of a case; my opinion was then that his case was hopeless—bleeding and impossible to tie vessels without reopening his abdomen. I did all I could to keep him from any consciousness of his hopeless condition, but he was conscious. * * * * I asked him this: 'Do you recollect a statement made by you before a Magistrate at Graniteville about this difficulty?' He answered, 'Yes, I recollect it.' I asked, 'Did you

State *vs.* McEvoy.

intend that as a dying declaration, James?' He said, 'Yes, I did.' I said, 'Would you make that statement now as your dying declaration?' He answered, 'Yes.'"

The rule of law as to the admissibility of dying declarations is well established, and, as stated in a recent case, (*The State* vs. *Quick*, 15 Rich., 349,) is as follows: " In order to the proper admission of such declarations it must appear satisfactorily that death was imminent at the time, and that the declarant was so fully aware of this as to be without any hope of life." Certainly the facts of this case were fully sufficient to make it appear satisfactorily that both of these conditions existed, for death was imminent, if not at the time the declarations were originally made, certainly when they were in effect repeated to Dr. Campbell within an hour before the death actually occurred, and every expression which came from the deceased renders it very manifest, to use his own language, that he made these declarations under the belief that he would " die certain " from the effects of the wound.

It is very clear, therefore, that there was no error on the part of the Circuit Judge in admitting these dying declarations as competent testimony.

The motions in arrest of judgment and for a new trial are refused.

*Willard*, C. J., and *Haskell*, A. J., concurred.